### EVANS *v.* STATE.

(Jan. 7, 1924.).

. [98 South. 440.  No. 23555.]

INTOXICATING LIQUORS. *Evidence held sufficient to support conviction for unlawful manufacture.*

The defendant was convicted of the charge of manufacturing intoxicating liquors. The evidence for the state showed that the witnesses for the state discovered a still such as is usually used for the manufacture of intoxicating liquors, which still had every appearance of having been very recently used. From thirty to forty feet from the still were found vessels containing intoxicating liquors of the character usually manufactured on such stills. The state's witnesses secreted themselves near the still and watched for two or three days. The first or the second day after the still and the intoxicating liquor were discovered the defendant appeared with two negro helpers and proceeded to repair the still and otherwise make preparations indicating a purpose to manufacture intoxicating liquors on said still. *Held,* the evidence was sufficient to sustain a conviction of the defendant for manufacturing the liquor found in the vessels on the day the witnesses for the state discovered the still.

On suggestion of error.  Overruled.
For former opinion, see 98 So. 65.

*W. A. Blair,* for appellant.

The court erred in not sustaining the motion of the defendant and appellant for a peremptory charge to the jury directing them to find a verdict of not guilty. This defendant was charged with manufacturing intoxicating whisky, he was not charged with owning a still, he was not charged with attempting to manufacture whisky, but with the direct charge of manufacturing intoxicating whisky. There is not a scintilla of evidence to show that any whisky was ever manufactured on this still or by the defendant on this still or any other, but on the contrary

all witnesses for the state swore that they did not see appellant manufacturing any whisky. They do say that they saw him at the still. _

In the case of *Anderson* v. *State,* 95 So. 637, the syllabus of the case reads as follows: "Before a defendant can be convicted of a violation of that statute there must appear from the evidence; first, that he manufactured liquor that can be used as a beverage; second, that the liquor is one of the kind specifically designated in the statute, or that it will in fact intoxicate." Neither of these two propositions did the state prove in the case at bar, and for those reasons this case should be reversed.

We especially call the court's attention to the case of *Hughes* v. *State,* reported in 96 So. 516, which is not yet in book form, but is to be found in the Southern Reporter Advance Sheets of July 14, 1923. This case is very similar to the case at bar. We quote from the syllabus as follows: "Evidence showing simply that defendant had a still and was preparing to manufacture intoxicating liquors but had not manufactured and when arrested would not support conviction for manufacturing."

In the Hughes case in the opinion of the court the Anderson case just cited above; is especially referred to; and using the wording of the court in the Hughes case we find as follows: "The evidence simply showed that appellant had a still and was preparing to manufacture intoxicating liquors when arrested by the sheriff, he had manufactured no liquor, the crime had not been committed."

We call the court's attention to the evidence for the state as we have especially done in our brief, that all witnesses testified that the still had not been connected up, nor had any whisky been manufactured on the still and the defendant was only found at the still one time and a very short time at that. The Hughes case in our judgment is a stronger case for conviction than the Evans case at bar, and if the court, we respectfuly submit, in-

tends to let the Hughes case stand, then in view of the Hughes case and the Anderson case that this Evans case should certainly be reversed.

*S. C. Broom,* Assistant Attorney-General, for the state.

It is the theory of the defense that inasmuch as the defendant was not seen to have manufactured the identical whisky found in the buckets there the night before the raid was made, and that whereas the work in and about the still that was being done by the defendant herein during the time they were watching him was in the nature of repairs, or improvemen s in the installation of the copper coil of pipes leading through the trough of water, that, therefore, the proof fails to show that he was actually guilty of the manufacture of liquor.

An examination of the record will disclose that this was a more or less pretentious outfit, being rather substantially constructed. It was not an ordinary tin can portable outfit which is sometimes used by negroes and others in the manufacture of a small quantity of intoxicating liquor. The proof shows that this still had actually been operated before at that identical place because there had been a fire in the furnace, and there was some manufactured liquor there.

It is quite evident that some liquor had been manufactured there already, and that they were getting ready to manufacture a large quantity of it, so that the proof is most conclusive that the defendant was guilty of an attempt to manufacture liquor, but they say that we do not prove that he actually manufactured that which was in existence there, but the proof as to this is as follows: First, the location of the still near appellant's home; and, Second, that all paths lead towards his house.

In view of all these facts, and the further fact that no one was seen at or near the still other than the defendant and these two negroes, I do not see how it could be said

that there could be a reasonably doubt in the minds of the jury as to his guilt; on the contrary it would be very unreasonable to assume that this liquor was manufactured by any other than the appellant herein.

*George T. Mitchell,* for appellant.

The court below proceeded upon the idea that if appellant did any usual and ordinary act necessary for the manufacture of intoxicating liquor, then he was guilty as charged, even though no liquor was afterwards manufactured, as a result of these usual and ordinary acts. In short, the court below permitted himself to become confused over the distinction between an attempt to commit a crime and the actual commission thereof. Carrying out his view of the case the court gave the following instruction for the state: "The court charges the jury for the state that if you believe from the evidence, beyond a reasonable doubt that the defendant, either alone or with others, manufactured intoxicating liquor, or performed any usual and ordinary act necessary for the manufacture thereof, at the time and place, and in the manner charged in the indictment, then you will find him guilty as charged."

It is only necessary to read this charge in connection with the facts as shown by the record to see at once the glaring error of the court in giving same.

The court seemed to have the idea that because two buckets of whisky were found some thirty or forty feet from the still some two or three days before appellant was seen at the still, that therefore it was a question for the jury to determine as to whether or not appellant had manufactured that whisky.

There is such a well defined line of demarcation between the crime of attempting to commit an offense, and the actual commission thereof that it does seem an utter waste of time to call the attention of this court to it. It

is well settled by this court that if a party is charged with the manufacture of intoxicating liquor, he cannot, under that indictment, be convicted simply on proof of an attempt to manufacture intoxicating liquor. , This was held in the case of *Hughes* v. *The State,* 96 So. 516. In that case Hughes was indicted and convicted of manufacturing intoxicating liquor, and the court in passing upon the facts, speaking through Judge ANDERSON, uses the following language: ''The evidence simply showed that appellant had a still and was preparing to manufacture intoxicating liquor. When arrested by the sheriff he had not manufactured any liquor, the crime had not been committed. Appellant made no confession that he intended to manufacture liquor on the still. Under the evidence for the state it is true that appellant may have been guilty of at least two other statutory crimes, but he was indicted for neither of these.''

The above opinion absolutely settles the instant case, and leaves no room for further argument. The ''two other statutory crimes,'' referred to in the opinion of Judge ANDERSON were clearly having a still in his possession, and attempting to manufacture intoxicating liquor.

Argued orally by *Geo. T. Mitchell* for appellant, and *S. C. Broom,* Special Assistant Attorney General, for the state.

ANDERSON, J., delivered the opinion of the court.

Appellant in his suggestion of error makes a vigorous attack on the opinion of the court handed down affirming this case. There was only a memorandum opinion prepared and handed down by the chief justice. Appellant's contention is that the evidence is wholly insufficient to sustain the conviction. That position is supported by two dissenting members of the court, Judges SYKES and

HOLDEN. Under these circumstances, we feel called upon to respond to the suggestion of error in the form of a written opinion.

The first and the main witness for the state was Crawford. His testimony was supported by that of the other witnesses for the state. The bench and bar perhaps will better understand the state's case by setting out Crawford's testimony as it appears in the record:

"Q. Mr. Crawford, you remember the occasion some time ago when you and the sheriff and Elzie Carr made a raid on a still out in the neighborhood where Mr. Evans lives? A. Yes, sir. Q. About when was that? A. It was during the May term of court, best I remember. Q. 1922? A. Yes, sir. Q. I believe you found a still and some whisky out there, did you? A. Yes, sir. Q. In what state and county did you find those things? A. State of Mississippi and Lee county. Q. Now, Mr. Crawford, go ahead and tell the jury just what you saw when you got there and what you did? A. We went out there on Monday, I believe it was; left here about ten o'clock; stayed out there all that evening, and Carr and myself spent the night out there. Q. How close did you locate yourselves to the place where you were watching? A. Oh, we were in forty or fifty yards of it. Q. What was at the place? A. There was a still there; some mash and some barrels. Q. Were you in view of the place where you could watch it? A. Yes, sir. Q. You spent Monday night there? A. Yes, sir. Q. Now, take up Tuesday morning and tell what you saw that day? A. Well, Tuesday morning we moved over. We went back across the hill long in the night some time about midnight. Didn't anybody show up, and we went across the hill and spent the balance of the night over there, and Tuesday morning we moved over there in sight of this place; and about 7:30 Mr. Evans and a couple of darkies come up to this place. Q. The defendant here and two negroes? A. Yes, sir. Q. Do you remember the names of

the negroes? A. Phil Traylor and John Mabry. And, so, they come up there about 7:30. Q. How did Mr. Evans come up there? ' A. He was walking and they were all together. Q. . Did he come with them or separately? A. They were all together; and they got busy about working round the still and doing first one thing and another; and Carr and myself decided that we were too close, and Mr. Inmon was coming back about 9 o'clock next morning to bring us a lunch, and we decided we were too close, so we moved back; slipped out and come back over the hill, and he got in about 9:30 or 10 o'clock with our lunch, and we could hear them working over there and hammering and sawing and nailing and driving stobs and so on, and it ceased a little after we ate our lunch, and Mr. Inmon walked over the hill to see if they were there, and he was to come back and report, and there come up a little shower of rain, and it was after 9 o'clock, and we got over the hill where we could see good, and we all decided that was a little too close, and we moved up to the right a hundred yards or so, and about 1:30, maybe 2 o'clock, these two darkies, same two darkies, came back and went to work, and a little later on, an hour and a half, maybe, Cleve Evans come back. Q. How did he come then? A. He come horseback that time; and they all worked round there together for a right smart little bit, and we decided we would separate and go round and sorter surround the place and close in on them about 5:30; and Mr. Carr and myself left Mr. Inmon where he was, and we went round to get a position, and before we got to the place where we were going, Mr. Evans got on his horse and went away from the still back towards the house, and I wasn't very far from the road, and he passed me riding his horse. Q. How close did he pass to you? A. Twenty or thirty steps; he didn't see me though. I was laying down on the ground; and, after he passed me and went on towards the house, I moved away from that place and got in a little thicket where the darkies were,

and one of the darkies come by me to pick up some wood or something, I don't know what it was; anyhow he saw me and saw something was wrong, and he turned round right quick and ran towards them, and I saw they were going to leave then, and I jumped up and hollowed to the boys to come in from the other side, and the negroes left there, and we went after them and caught them. Mr. Inmon caught Phil, and I caught Mabry, and we carried the negroes back down to the still, and Mr. Carr and Mr. Inmon went to the house and brought Mr. Evans back down.

"Q. What examination did you make of the still site? A. Well, there was three barrels of mash there buried in the ground, just a little of the tops sticking out, and they were covered with tin, and there was a furnace dug in the bank right by the side of a little branch, and in that furnace was fifty or sixty gallon gasoline tank. Q. What was its condition with reference to being used? A. It was full of mash. Q. I mean what was its condition with reference to having been used before? A. It had been used because the furnace had been cleaned out, and we saw these negroes cutting wood, and they cleaned out the furnace and filled it full of dry wood. Q. What kind of stuff did they take out? A. Chunks and things. Q. This furnace, state whether or not it was clean or smutty? A. Oh, it was smutty. Q. These barrels of mash you spoke of, what is that mash? A. Well, it is a preparation they tell me they put up to make whisky out of. Q. Do you know whether there is any other purpose for which it can be used for; if that stuff you found in those barrels were put into that kettle above the furnace, and that kettle was connected up with a worm, and the worm run through a trough of water, what would be the necessary result? A. Well, it would make whisky out of it. Q. How many stills have you raided? A. I don't know; good many. Q. Did you find anything else round there? A. We found, I think the night before, not the night we stayed

all night, we went down there the night before—we found a couple of buckets pretty close to the barrels of mash; a molasses bucket with whisky in it. Q. How much? A. Well, I think it was full; I know one of th..n was.

"By the Court: What kind of whisky was it? A. It was this white looking whisky I suppose, made out of some of that stuff.

"Mr. Mitchell: We object to supposing. A. I reckon it was ten or fifteen steps from the still to where it was found a little further.

"By Mr. Berry: Now, during the time you laid there in hiding on Monday and Tuesday—just confine yourself to the time you laid in hiding on Tuesday—what did you see the defendant, Cleve Evans, do around about the still? A. The first thing he did that morning he looked at this beer; and they were just working there together at that time; and we were so close I don't know just what part he did do at that time; we were so close we were figuring on getting away, not disturbing them. That afternoon he was working on this trough business. They would drive a stob or two down and nail a cleat across it and the trough set up between these two stobs on a cross-piece, and down at the end of the second trough was a little hole dug there and a stone jar set in that hole, and this copper worm, straight pipe, was put through these troughs, and they didn't quite get it connected up back to the still, but they had it in the troughs and he was working at that time. Q. Mr. Crawford, in the manufacture of whisky is that trough a necessary part of the outfit? If so, explain to the jury its function. A. Yes, sir; it is necessary from what I have seen at other stills in operation. Q. Why was it necessary? A. This worm goes through that trough, and this trough was filled with water, and the steam rises from the boiler and goes through the pipe, and when it goes through that water it cools down, it condenses it, and at the end of the pipe it is dropping out. Q. Is that where that stone jar was? A. Yes, sir.

"By the Court: How long have you known Cleve Evans? A. I expect six or seven years; maybe longer, Judge. Q. What county and state was that in? A. State of Mississippi, Lee county. Q. Did you see him down there any day besides Tuesday? A. I didn't under-stand you awhile ago. Q. You went there Monday? A. Went there Monday. Q. Did you see Cleve Evans there Monday? A. Didn't see anybody there Monday at all. Q. Tuesday morning? A. Tuesday morning was the first time I saw him.

"Cross-examination by Mr. Mitchell.

"Q. Mr. Crawford, you say the still was not connected up; the worm was not connected? A. The worm was in the trough and back to the condenser, but from the condenser to the main boiler it hadn't been connected. Q. I say the worm was not connected to the boiler? A. No, sir. Q. Couldn't have made any whisky on that still like it was when you found it? A. It hadn't been finished, rigged up. Q. I say, in the condition it was when you found it, couldn't any liquor have been made on it, could it? A. No, sir. Q. You say you saw some barrels of mash out there; you don't know who prepared that mash and who put it there, or how long it had been there, or anything of that kind? A. No, sir; I do not. Q. This still was not on Cleve Evans' land, was it? A. I really don't know, except what they said about that, Mr. Mitchell. Q. It is your information that it was on some-body else's land, isn't it? A. Yes, sir. Well, he told me where the lines was down there. Q. Now, when you arrested these negroes, Cleve Evans wasn't there, was he, at that time, as I understand? A. No, sir; he wasn't there. Q. Now, after you all arrested these negroes, you all went up to the home of one of these negroes, didn't you? A. No, sir; I didn't. Q. Did the others? A. No, sir; they brought the darky back to the still and left the two darkies with me, and Mr. Carr and Mr. Inmon went

to Mr. Evans' house. Q. Were you with them the next day when they went up there and searched this negro's house? (Objected to. Objection sustained. Excepted to.) Q. Without stating what you found, if anything, I want to know did you search either one of these negroes' houses the next day? (Objected to. Objection sustained. Excepted to.) Q. Is it not a fact that you did search the house of one of these negroes the next day and found mash in his house? (Objection withdrawn.) A. I didn't do that. Q. Do you know who it was that made that search? A. Mr. Inmon and Mr. Whitesides, in my judgment. Q. All right; I just wanted to find out. Now, Mr. Crawford, this whisky, these two buckets of whisky that you say you saw up there near the still, you don't know how long that whisky had been there? A. No, sir; do not. Q. Don't know whether it was made on that still or not? A. No, sir. Q. Don't know whether it was made in Mississippi, Alabama, or where or by whom? A. No, sir. Q. Now, Mr. Crawford, on Tuesday, I believe you say that this defendant came down there and you saw him working on this trough. A. Yes, sir. Q. There had been no whisky made on that still that you saw up to that time?

"Mr. Berry: He has answered that.

"Mr. Mitchell: No, he hasn't.

"Q. Had you seen any liquor made on that still at all? A. No, sir. Q. Never did see any made on it? A. No, sir. Q. You never saw this defendant make any whisky at all? A. No, sir. Q. You captured that still? A. Yes, sir. Q. Took it in your possession and cut it up down there? A. No, sir; cut it up right there. Q. After you all discovered that still and after you all saw this defendant working on that trough there, there never was any liquor manufactured on that still after that time, was it? (Objected to. Objection sustained. Excepted to.) Q. That trough you saw him working on there was never used in connection with that still in manufacturing

133 Miss.—43

intoxicating liquor, was it? (Objected to. Objection sustained. Excepted to.) Q. Did you all destroy that trough in connection with the other? A. I don't think we did; we destroyed that pipe, pulled it out of there, but I don't think we busted the troughs up.

"Redirect Examination.

"Q. Did you all have a search warrant out there? A. Yes, sir. Q. Describing these premises? A. Yes, sir. Q. Whose land was this on? A. On Uncle Dave Evans, so they say. Q. What relation to the defendant? A. Uncle, I suppose."

It will be observed from Crawford's evidence that he and the witnesses Carr and Inmon first went to where this still was located on Monday and lay around in the vicinity of the still watching for the most of two days and at least one night. It is not clear whether appellant was arrested the next day, Tuesday, or the next, Wednesday. When these witnesses located the still on Monday, they found there, in ten or fifteen steps of the still, two buckets of whisky. As it appears from Crawford's testimony, when the state's witnesses found the still on Monday, it had every appearance of having been recently operated. This was shown by the ashes and soot as well as the whisky found near the still, which the witness Crawford refers to as "white lightning." Without the proof of the finding of the whisky in close proximity to the still, which evidently had been recently operated, the evidence would have been insufficient to sustain the conviction. Appellant in his suggestion of error seeks to confine the state to what took place after the still was discovered. He urges there was no evidence that appellant manufactured whisky on said still after that. That is true. There was sufficient evidence, however, to go to the jury on the question of whether or not the two buckets of whisky found at the still had been, within the time limit of the statute, manufactured by appellant. We hold that the evidence was amply sufficient. There they found the

still, the mash, the evidence of recent operation of the still, and appellant coming and going making preparation to manufacture more whisky. Was it not a reasonable inference from these facts and circumstances that appellant manufactured or assisted in the manufacture of the two buckets of whisky found near the still, and that the same had been manufactured only a few days previously? We think it was. It required no stretch of the imagination under this evidence for the jury to find appellant guilty and be convinced of his guilt beyond a reasonable doubt. Some one else, it is true, may have manufactured the two buckets of whisky found near the still and left it there, but that is not a reasonable theory; the reasonable theory being that he did it, or had it done by the two negroes found laboring about the still with him.

*Suggestion of error overruled.*